LaSHAWN A., et al., Appellees

v.

Marion S. BARRY, Jr., as Mayor
of the District of Columbia,
et al., Appellants.

No. 94–7044.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1995.

Decided Oct. 31, 1995.

Rehearing In Banc Granted Jan. 30, 1996.

Donna M. Murasky, Assistant Corporation Counsel, argued the cause for appellants. With her on the briefs were Garland Pinkston, Acting Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel.

Christopher T. Dunn argued the cause for appellees. With him on the brief were Marcia R. Lowry, Elizabeth Symonds and Arthur B. Spitzer.

Before: WILLIAMS, HENDERSON and RANDOLPH, Circuit Judges.

Dissenting opinion filed by Circuit Judge RANDOLPH.

STEPHEN F. WILLIAMS, Circuit Judge:

This case appears before us for the second time, with the defendants—the mayor and other officials of the District of Columbia—asking for relief from a consent decree pursuant to which the district court is exercising broad supervisory authority over the District's child welfare system. Because the district court has not re-examined the validity of the federal claims underlying its jurisdiction since the Supreme Court issued a decision that seems to undermine the statutory support for federal jurisdiction (though not the constitutional basis of certain claims), we remand the case to the district court to perform that re-examination. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

\* \* \*

Plaintiffs, a class of children who either are in foster care under the supervision of the D.C. Department of Human Services ("DHS"), or have been reported to be abused or neglected but are not yet in DHS care, sought injunctive relief based on alleged violations of federal statutory and constitutional law, as well as of local law.

The district court agreed for the most part with plaintiffs. *LaShawn A. v. Dixon,* 762 F.Supp. 959 (D.D.C.1991). It found explicitly that the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–27 and §§ 670–79, afforded plaintiffs rights actionable under 42 U.S.C. § 1983 (1988), and held implicitly that the Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101–06, did so as well. See 762 F.Supp. at 988–89. It detailed widespread violations of those statutes. *Id.* at 968–87. The court proceeded to find that children in foster care under the supervision of the District enjoyed a liberty interest under the U.S. Constitution, *id.* at 991–92, with a concomitant right to such services as were "essential to preventing harm" to the children, *id.* at 993. Compliance with this norm was to be measured by the "professional judgment standard", drawn from *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). Under that standard, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. at 2462 (quoted at 762 F.Supp. at 994). Finally, the court held that various practices of the District violated that standard, as well as the two pertinent federal statutes and various provisions of local law. 762 F.Supp. at 996–98. It did not find a private right of action for the children under D.C. law, although its discussion of possible entitlements protected under the due process clause may have assumed such rights. *Id.* at 993–94.

In response to this merits determination, the parties negotiated a broad consent decree, which in its current form occupies 90 single-spaced pages and constitutes a rather comprehensive manual for the conduct of the

District's child welfare activities. The agreement reserved defendants' right to appeal the district court's liability ruling and addressed the possibility that the court's merits opinion might be "vacated" in whole or in part. Section XXII(C) provides:

> In the event that the court's Memorandum Opinion of April 18, 1991, is vacated on appeal in its entirety, this Order and any subsequent implementation plan or plans shall be null and void. In the event that the court's Memorandum Opinion of April 18, 1991, is vacated on appeal in part, the portions of this Order or any subsequent implementation plan or plans that are directly based on that part of the Memorandum Opinion that is vacated shall be null and void.

In their first appeal, defendants challenged the findings of constitutional violations. They also claimed that, in light of the intervening Supreme Court decision in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), holding that §§ 671(a)(9) & (a)(15) of the Adoption Assistance Act are not enforceable in a § 1983 action, the federal statutes on which the district court had relied were not enforceable by private plaintiffs. This court found it unnecessary "to confront these constitutional and federal statutory issues, for the district court judgment is completely supportable on the grounds of local law", which, we said, creates a private cause of action both "for children in foster care and for children reported to have been abused or neglected but not yet in the District's custody." *LaShawn A. ex rel. Moore v. Kelly*, 990 F.2d 1319, 1322, 1325 (D.C.Cir. 1993). Because the consent decree had been drafted to conform to federal as well as local law, we remanded to the district court "with instructions to fashion an equally comprehensive order based entirely on District of Columbia law, if possible. If there are any portions of the consent decree that depend entirely on a federal statute, the district court should consider the impact of [*Suter*] on those provisions before it includes them in the revised consent decree." *Id.* at 1326.

On remand, the district court declared, despite our having explicitly sidestepped the issue of liability under federal law, that we had "clearly affirmed this Court's Memorandum Opinion." *LaShawn A. v. Kelly*, Civ. No. 89–1754, Order at 1 (D.D.C. Nov. 12, 1993) (citing our decision, 990 F.2d at 1326 ("Because the district court's judgment is independently supportable by District of Columbia law, we affirm the court's decision in favor of the children in this case.")). On that basis, it rejected defendants' argument that § XXII(C) of the consent decree required modification of the decree. *Id.* at 2. It did not in any way address whether other circumstances—such as the *Suter* decision itself—might require modification of the decree or re-examination of the court's jurisdiction under *United Mine Workers v. Gibbs*. After modifying certain provisions of the consent decree to remove terms that the parties evidently agreed were in violation of District law, it rejected defendants' contention that some provisions still violated local law. It acknowledged that the decree "exceeds the specific mandates of local law", but found the excess "a necessary and appropriate use of [the court's] equitable authority" in light of defendants' "widespread local law violations". *LaShawn A. v. Kelly*, Civ. No. 89–1754, Order at 1 (D.D.C. Jan. 27, 1994). See also Order of Nov. 12, 1993 at 2 ("To the extent that portions of the remedial order exceed the terms of local law, the Court invokes its equitable authority in approving the consent decree.").

\* \* \*

Defendants now return to us, questioning whether the district court has jurisdiction to enforce a wide-ranging institutional reform order against the government of the District of Columbia based entirely on District of Columbia law. We regard the defendants' claim as basically posing a question under step 2 of *Gibbs*, namely, whether, given power at the outset *in a generalized sense* to decide the plaintiffs' state law claims, the district court should, despite *Suter*, exercise that power in the form of continuing to enforce a massive institutional reform decree of the sort it had originally adopted.

*Law of the Case Considerations*

Plaintiffs respond that the jurisdictional question has already been decided, by the panel in the first appeal, so that defen-

dants' claim is barred by law-of-the-case doctrine. That doctrine embodies the general rule that

> a court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases. When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court.

*Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C.Cir.1995). The doctrine normally applies to issues decided explicitly or "by necessary implication". *Id.*

These conventional requirements have certainly been fulfilled in this case. The prior panel's decision necessarily implied that a remedial order supported entirely by local law could properly be entered. The court explicitly recognized that its affirmance rested "entirely on the basis of local law", *LaShawn A. v. Kelly*, 990 F.2d at 1326, and implicitly held that an order devoid of federal support would present no jurisdictional problem. We said that our "authority to decide the case entirely on pendent state grounds is incontrovertible", *id.*, citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 722, 86 S.Ct. 1130, 1136, 16 L.Ed.2d 218 (1966), for the proposition that a federal court presented with federal and local law claims may, "even though the federal ground be not established ... nevertheless retain and dispose of the case upon the non-federal ground", *id.* (emphasis deleted). As to the second step required by *Gibbs,* the decision whether under the conditions prevailing the district court should exercise power over the pendent local-law claim by continuing enforcement of a 90–page child welfare code, the prior panel passed *sub silentio*. Its remand to the district court for entry of an order based entirely on local law necessarily implied that the answer to this question was "yes".

■ Law of the case, however, is a prudential doctrine that "merely expresses the practice of courts generally to refuse to re-open what has been decided, not a limit to their power." *Messinger v. Anderson,* 225

U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) (Holmes, J.) (citations omitted). "A court has the power to revisit prior decisions *of its own* or of a coordinate court in any circumstance". *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) (emphasis added). The Court in *Christianson* noted, however, that "as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.' " *Id.* (citation omitted).

In *Christianson* itself, the Court rejected defendant's theory that the Seventh Circuit's determination that it lacked jurisdiction bound the Federal Circuit to that view, on transfer from the Seventh. Once the Federal Circuit decided that the Seventh's view was " 'clearly wrong' it [the Federal Circuit] was obliged to decline jurisdiction," *id.* at 817, 108 S.Ct. at 2178, thus applying the conventional exception for clear error. In any event, law of the case in the lower courts could not constrain the Supreme Court's *own* review. "Just as a district court's adherence to law of the case cannot insulate an issue from appellate review, a court of appeals' adherence to the law of the case cannot insulate an issue from this Court's review." *Id.* In a footnote dictum, however, the Court said,

> There is no reason to apply law-of-the-case principles less rigorously to transfer decisions that implicate the transferee's jurisdiction. Perpetual litigation of any issue— jurisdictional or nonjurisdictional—delays, and therefore threatens to deny, justice. But cf. *Potomac Passengers Assn. v. Chesapeake & Ohio R. Co.,* ... 520 F.2d 91, 95 n. 22 [ (D.C.Cir.1975) ].

486 U.S. at 816 n. 5, 108 S.Ct. at 2178 n. 5.

As the "But cf." cite suggests, our holding in *Potomac Passengers* directly contradicted the *Christianson* dictum. In *Potomac Passengers* this court found that it had erroneously decided a jurisdictional issue in a prior appeal and proceeded to correct the mistake. Though apologizing for the earlier mistake, the court insisted on the need for correctness as to issues of subject matter jurisdiction:

"When an appellate court makes so fundamental an error as that of sustaining federal subject matter jurisdiction where none exists, we think the court must exercise its discretion to correct that mistake." 520 F.2d at 95 n. 22. *Potomac Passengers* has been widely cited for the proposition that jurisdictional questions are relatively unrestrained by law of the case.[1]

Courts have applied *Christianson*'s discussion of law of the case doctrine relating to jurisdictional questions only in cases involving the propriety of transfers.[2] See, e.g., *Ukiah Adventist Hospital v. FTC*, 981 F.2d 543, 546 n. 4 (D.C.Cir.1992) ("Review of a transfer order [including jurisdictional grounds] in a transferee court is exceedingly limited.") (dictum citing *Christianson*); *Wang Laboratories v. Applied Computer Sciences*, 958 F.2d 355, 358 (Fed.Cir.1992) (accepting case transferred by First Circuit, the court reasoned that "if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end"); *Moses v. Business Card Express*, 929 F.2d 1131, 1137 (6th Cir.1991) (upholding, under *Christianson*, district court's decision to apply law-of-the-case principles to transfer decision made pursuant to forum selection clause; technically venue rather than jurisdictional issue). While courts have sometimes applied law of the case to jurisdictional questions, in doing so they have neither relied on the *Christianson* dictum nor even expressly considered whether jurisdictional issues called for special treatment. See *McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 351 (D.C.Cir.1995); *In the Matter of Memorial Estates*, 950 F.2d 1364, 1367 (7th Cir.1991); *Oneida Indian Nation of New York v. State of New York*, 860 F.2d 1145, 1151 (2d Cir. 1988); *Gould v. Mutual Life Ins. Co.*, 790 F.2d 769 (9th Cir.1986) (pre-*Christianson* ). And two of the circuits that once applied law of the case to a jurisdictional issue without

discussion, the Ninth and the Second, later refused to do so when they zeroed in on the special character of jurisdictional matters. In *Matek v. Murat*, 862 F.2d 720, 724 n. 1 (9th Cir.1988), decided several months after *Christianson*, the Ninth Circuit held that a district court was not barred by law of the case from reconsidering its own non-final orders. The court cited *Potomac Passengers* for the proposition that "[s]ubject matter jurisdiction, because of its intrinsic importance to the judicial power of the federal courts, is particularly suitable for reconsideration." *Id.* And the Second Circuit applied the same principle in *DiLaura v. Power Authority*, 982 F.2d 73, 77 (2d Cir.1992), noting that "subject matter jurisdiction is particularly suited for reconsideration", although, to be sure, as Judge Winter noted in a separate opinion, the issue was in fact moot because what might have been law of the case for the district court could not have prevented review by the court of appeals, see *id.* at 81. Wright & Miller have noted that "[q]uestions of subject matter jurisdiction are particularly apt to be free of law of the case principles", citing *Potomac Passengers*. Wright & Miller, *Federal Practice and Procedure* § 4478 at 799 n. 32 (1981) (under the heading "Suitable to Reconsider"). "In addition to the great importance that is generally attributed to jurisdictional limits, such questions may at times involve *matters of discretion that inherently require reexamination as a case progresses*", *id.* (emphasis added), the latter phrase being apparently an allusion to step 2 of *Gibbs*. The 1995 Supplement to Wright & Miller does not modify that passage, 1995 Supplement at 739–40 n. 32, citing *Christianson* under the separate category of "Propriety of Transfer: Transferor reconsideration", *id.* at 730 n. 26.

The dissent attempts to elevate law of the circuit doctrine (which supposedly has no

---

1. See, e.g., *Green v. Dept. of Commerce*, 618 F.2d 836, 839 & n. 9 (D.C.Cir.1980); *Amusement & Music Operators Ass'n v. Copyright Royalty Tribunal*, 636 F.2d 531, 532–33 & nn. 2–4 (D.C.Cir. 1980); *Acton Corp. v. Borden*, 670 F.2d 377, 380 n. 2 (1st Cir.1982); *Crane Co. v. American Standard*, 603 F.2d 244, 247 (2d Cir.1979); *EEOC v. Neches Butane Products Co.*, 704 F.2d 144, 147 n. 2 (5th Cir.1983); *Amen v. City of Dearborn*, 718 F.2d 789, 794 (6th Cir.1983); *Christianson v.*

*Colt Industries Operating Corp.*, 798 F.2d 1051, 1056 (7th Cir.1986).

2. The lone exception seems to be a case involving personal, not subject matter, jurisdiction. *In the Matter of Oil Spill by the Amoco Cadiz Off the Coast of France on March 16, 1978*, 954 F.2d 1279, 1292 (7th Cir.1992).

exceptions) above law of the case doctrine (which concededly does). Dissent at 571–572. Plaintiffs, although they argued law-of-the-case vigorously, never suggested this distinction, perhaps because they thought there was none—that at the court of appeals level exceptions to law of the case were necessarily the same as exceptions to law of the circuit. Nor did our own precedent on the subject, *Potomac Passengers*, perceive such a distinction.

Among jurisdictional issues, the ones most strongly inviting a relaxed application of law of the case are those that the prior decision never explicitly confronted. In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("*Pennhurst II*"), the Court certainly acted as if such an exception to ordinary law of the case doctrine existed. In *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) ("*Pennhurst I*"), the Court itself cast doubt on the federal basis for a consent decree enforced against state officials, see id. at 18–27, 101 S.Ct. at 1540–45, and remanded the case to the Court of Appeals to determine the validity of the federal claims. The Court also remanded state law claims to determine "whether state law provides an independent and adequate ground which can support the court's remedial order." *Id.* at 31, 101 S.Ct. at 1547. The remand order thus necessarily implied that a federal court would have jurisdiction to enter the order on state law grounds alone.

On remand, the Court of Appeals acted on the implied permission *Pennhurst I* had given and found that the Pennsylvania statute provided "adequate support for [the order] independent of federal law". *Halderman v. Pennhurst State School & Hospital*, 673 F.2d 647, 656 (3d Cir.1982). Again the Supreme Court reversed, holding that the Eleventh Amendment denies federal courts jurisdiction to order state officials to conform their conduct to state law. 465 U.S. at 117–21, 104 S.Ct. at 917–19. It brushed aside several earlier implicit rulings to the contrary in other cases, announcing that stare decisis

principles did not bind its reconsideration of the jurisdictional issue. ("When questions of jurisdiction have been passed on in prior decisions *sub silentio*, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us." *Id.* at 119, 104 S.Ct. at 918.)

Pennhurst II is not, of course, identical to the current issue. First, the direct bar of the Eleventh Amendment is plainly of greater force than the discretionary jurisdictional limit of *Gibbs* step 2. Second, though the Court alluded to implicit holdings to the contrary in *other* cases, it did not acknowledge the necessary implication of *Pennhurst I* that there was federal jurisdiction for an injunction resting solely on state law, and thus an obvious ground for applying law-of-the-case. Especially given the merely "prudential" character of law-of-the-case restrictions, and the doctrine's grounding in concerns of judicial economy, see, e.g., *Crocker*, 49 F.3d at 739–40, however, the Court's action strongly suggests that law-of-the-case considerations give way more readily to jurisdictional concerns, at least where the initial decision has failed to address the issue explicitly.

■ We thus turn to consider whether a *Gibbs* step 2 inquiry is jurisdictional. When a federal court is presented with a combination of federal and state claims, it must pursue the two-step analysis outlined in *Gibbs*. 383 U.S. at 725–27, 86 S.Ct. at 1138–40.[3] The first step requires the court to evaluate the substantiality of the federal claim and whether the state and federal claims "derive from a common nucleus of operative fact". *Id.* at 725, 86 S.Ct. at 1138. If these requirements are met, then "there is *power* in the federal courts to hear the whole". In our first pass at this case, we got that far and stopped. Finding that there had been (prior to *Suter*) a substantial federal claim, we asserted "incontrovertible" authority "to decide the case entirely on pendent state grounds". 990 F.2d at 1326.

But *Gibbs* makes clear that that should not be the end of the inquiry. The Supreme Court has spoken of *Gibbs* step 2 in terms

---

**3.** Because this litigation was commenced before December 1, 1990, the new supplemental jurisdiction statute, 28 U.S.C. § 1367 (Supp. V 1993), does not apply.

that mark it as a jurisdictional inquiry, in the sense that it requires continuous re-examination as the litigation and surrounding legal context develop. As *Gibbs* itself says:

> That power need not be exercised in every case in which it is found to exist.... Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.... The question of power will ordinarily be resolved on the pleadings. *But the issue whether pendent jurisdiction has properly been assumed is one which remains open throughout the litigation.* Pretrial procedures or even the trial itself may reveal a substantial hegemony of state law claims, or likelihood of jury confusion, which could not have been anticipated at the pleading stage. Although it will of course be appropriate to take account in this circumstance of the already completed course of the litigation, dismissal of the state claim might even then be merited.

383 U.S. at 726–27, 86 S.Ct. at 1139 (emphasis added). And more recently the Court stated in *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988):

> Under *Gibbs*, a federal court should consider and weigh in each case, *and at every stage of the litigation*, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Id.* at 350, 108 S.Ct. at 619 (emphasis added).[4]

Lower federal courts of appeals, including this circuit, have followed the Supreme Court's lead and treated the *Gibbs* step 2 inquiry as jurisdictional—and accordingly have raised the issue on their own. The Seventh Circuit raised a *Gibbs* step 2 issue sua sponte in *Maguire v. Marquette University*, 814 F.2d 1213, 1218 & n. 4 (7th Cir. 1987). After dismissing plaintiff's federal claim before trial, the district court had proceeded to review a pendent state law claim on the merits. Although defendant did not raise a *Gibbs* step 2 issue on appeal, the Seventh Circuit declared that "because the rule is jurisdictional, we are obligated to raise it ourselves." *Id.* at 1218 n. 4 (emphasis added). The court then vacated the district court's dismissal of the pendent claim on the merits. This court has likewise treated *Gibbs* step 2 analysis as jurisdictional and raised the issue sua sponte. In *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1361 (D.C.Cir.1990), the district court had previously dismissed both federal statutory and state contract claims under the Free Exercise Clause of the First Amendment. This court held that the district court had correctly dismissed the federal statutory claims, but had incorrectly dismissed the state contract claims on First Amendment grounds. Without prompting, the court proceeded to hold that because the district court had properly dismissed the federal claim before trial, under *Gibbs* step 2 it should also dismiss the pendent state law claim unless it found diversity of citizenship. *Id.*

The dissent dispatches *Maguire* and *Minker* by characterizing them as applications of a newly coined *Gibbs* step one-and-a-half—cases where the federal claim survives step 1 but is dismissed before trial. Dissent at 575. Thus, in its view, the Seventh Circuit's and our treatment of that situation as jurisdictional can't possibly mean that *Gibbs* step 2 is jurisdictional. But until the dissent, no one has perceived this circumstance as

---

**4.** Cf. *Evans v. City of Chicago*, 10 F.3d 474, 479 (7th Cir.1993) (en banc) (holding that mere consent of local officials, without viable federal claim, could not justify continued enforcement of decree against city) ("the court must ensure that there is a substantial federal claim, *not only* *when the decree is entered but also when it is enforced*, and that the obligations imposed by the decree rest on this rule of federal law rather than the bare consent of the officeholder") (emphasis added).

involving a special kind of *Gibbs* step; it is simply an instance of *Gibbs* step 2 so clear that any continued assertion of jurisdiction by the district court would be an abuse of discretion. See *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

■ In sum, the key issue here—the application of *Gibbs* step 2—(1) is jurisdictional, and thus is subject to continuous reexamination throughout the enforcement of a consent decree (even without a party's raising it) and (2) was never explicitly addressed in our prior decision. Our non-discussion of the finding of continued jurisdiction suggests that it consumed few or no judicial resources. Taking our cue from the Supreme Court in *Pennhurst II*, therefore, we conclude that the interest in limiting federal courts to the exercise of their proper jurisdiction outweighs the marginal contribution to stability and judicial economy that could be achieved by giving finality to our prior *sub silentio* treatment of the *Gibbs* step 2 issue.

*Gibbs Step 2 Analysis*

■ As we said before, the first part of the *Gibbs* test is satisfied once a federal court is determined to have *power* over state claims because of a substantial related federal claim. That part is indeed satisfied here. Step 2 of the *Gibbs* test requires a weighing of factors to determine whether, although power exists, it should be exercised in favor of jurisdiction. These factors include judicial economy, convenience and fairness to litigants, avoidance of needless decisions of state law (in order to promote comity and obtain a "surer-footed reading of applicable law"), the timing of the dismissal of the federal claims, the predominance of state versus federal issues, and the potential for jury confusion. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The initial decision lies in the discretion of the district court, subject to review for abuse of discretion in the court of appeals. *Edmondson & Galla-*

*gher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1265–66 (D.C.Cir.1995).

■ Two circumstances weigh heavily against allowing pendent jurisdiction: federal claims have either dropped out or are greatly weakened, and the local claims lead to extensive entanglement in local government operations.

First, the elimination or weakening of federal claims obviously weighs against exercise of pendent jurisdiction.[5] *Gibbs* itself said: "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." 383 U.S. at 726, 86 S.Ct. at 1139. Courts have held that pendent state claims should be dismissed if the federal claim drops out quite late, even after trial. See, e.g., *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 564 (2d Cir.1991) ("The judicial economy factor should not be the controlling factor, and it may be appropriate for a court to relinquish jurisdiction over pendent claims even where the court has invested considerable time in their resolution."); *Powell v. Gardner*, 891 F.2d 1039, 1047 (2d Cir.1989) (holding that even after a trial on the merits, district court properly dismissed pendent state law claims after directing a verdict in favor of defendant on federal claim).

■ Similarly, predominance of local law issues weighs against exercise of pendent jurisdiction. In *Gibbs*, the Supreme Court noted "if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, *or of the comprehensiveness of the remedy sought,* the state law claims may be dismissed without prejudice". 383 U.S. at 726, 86 S.Ct. at 1139 (emphasis added). As *Gibbs* suggests, considerations of comity weigh especially heavily in cases involving massive consent decrees controlling government bodies. Even before *Pennhurst*, federal courts

---

5. We do not hold that the disappearance of federal claims from a case *automatically* deprives a federal court of jurisdiction over all types of pendent claims, which would be contrary to *Rosado v. Wyman*, 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970). The dis-

appearance or weakening of federal claims are simply factors to be considered in step 2 of a *Gibbs* analysis. We do not understand why the dissent flogs us with "conflict[ing] directly with *Rosado.*" Dissent at 576–577.

were concerned about controlling state agencies through exercise of pendent jurisdiction under *Gibbs* step 2. In *Evans v. Buchanan,* 468 F.Supp. 944, 956 (D.Del.1979), for example, the court refused to exercise pendent jurisdiction under *Gibbs* to redesign a state school district tax, citing "the intricacies of the state-law issue" and "questions of comity raised by the remedies proposed." [6]

 Although injunctions against District of Columbia officials based on District law are not outright banned under the Eleventh Amendment, which applies only to states,[7] *Pennhurst II* does suggest that, in general, injunctions against nonfederal officials based on nonfederal law should be disfavored. Indeed, we have consistently stressed the respect due the courts of the District of Columbia in applying District law. In applying jurisdictional aspects of exhaustion doctrine, for example, we have noted that "the federal courts owe to the District of Columbia the comity extended to a state". *Committee of Blind Vendors of the District of Columbia v. District of Columbia,* 28 F.3d 130, 134 (D.C.Cir.1994). Moreover, we have followed this principle in applying Gibbs step 2. In *Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 772 (D.C.Cir.1982), we held that the district court had abused its discretion in exercising pendent jurisdiction over novel and unsettled questions of D.C. law (fiduciary duty issues). And in *Grano v. Barry,* 733 F.2d 164 (D.C.Cir.1984), we underlined the importance of avoiding unnecessary federal court invasions of local self-government. One part of an injunction had become moot and the other rested solely on a mistaken belief that local officials' violation of local law *ipso facto* violated the federal Constitution. After explaining that local law violations were not automatically federal violations and that rights created by local law should normally be vindicated in local courts,

we turned to the possibility of pendent jurisdiction and rejected it:

> In general, "principles of comity and the desirability of a 'surer-footed reading of applicable law' support the determination of state claims in state court." [Citing *Gibbs* and a D.C. Circuit case.] [3] Determination by the state court is especially important where the case involves "novel and unsettled" issues of state law.... Here, the law in question is new, its meaning ambiguous and sharply disputed. Moreover, the district court should not retain jurisdiction because this case *directly implicates the processes by which a locality governs itself.* Appellees' remedy, if any, lies in the courts of the District of Columbia.

---

3. Although the District of Columbia is constitutionally distinct from the states, it may nevertheless be treated as a state for present purposes....

*Id.* at 169 (emphasis added). Similarly, in *Angela R. by Hesselbein v. Clinton,* 999 F.2d 320 (8th Cir.1993), while the court found the first step of *Gibbs* satisfied in a case under the Fourteenth Amendment, the Adoption Assistance and Child Welfare Act, and the Child Abuse Prevention and Treatment Act, and while it for unexpressed reasons did not regard the *Pennhurst II* bar as insurmountable, *id.* at 325, it cautioned the district court about devoting federal judicial resources to enforcement of a decree under a pendent state law claim—even where the state legislature had explicitly imposed the precise terms of the decree on the state welfare agency. Noting the "decidedly minor" interest of federal courts in remedying violations of state law, *id.* at 325–26, the court vacated the decree and remanded the case to the district court, with instructions to weigh the "constitutional, statutory, and institutional

---

6. See also *Catalano v. Dept. of Hospitals,* 299 F.Supp. 166, 175 (S.D.N.Y.1969) (refusing to exercise pendent jurisdiction under *Gibbs* to determine whether income exemption regulation conformed to state law, since issue "presents a question of state legislative intent and delegation of powers to an administrative body, which more appropriately lies within the ambit of the state court's expertise with respect to its own laws").

7. We note that the First Circuit has interpreted the term "state", as used in the Eleventh Amendment, to include more than just the 50 obvious ones, ruling that Puerto Rico is covered by the Eleventh Amendment "in the same manner, and to the same extent, as if [it] were a State." See *De Leon Lopez v. Corporacion Insular de Seguros,* 931 F.2d 116, 121 (1st Cir.1991). But we decline to follow the First Circuit's approach here.

factors that bear upon the task of crafting a suitable equitable decree". *Id.*[8]

 It is true that we have upheld an injunction against District officials based solely on pendent District law grounds. See *District of Columbia Common Cause v. District of Columbia,* 858 F.2d 1, 10 (D.C.Cir. 1988). But there our application of *Gibbs* step 2 found only that the district court had not abused its discretion by ordering an injunction against the District of Columbia prohibiting it from spending public funds to oppose citizens' initiatives. Such a limited, prohibitory injunction offends the principle of comity to a far lesser extent than the wide-ranging, positive institutional reform injunction here.

So far, we have considered the two factors of a vanishing federal claim and an intrusive remedy based on local law grounds separately. But the two factors are closely related. *Gibbs* sets out a multi-factor balancing test, and presumably a factor pointing in one direction could offset one pointing in the other, and a strong factor pointing in one direction would reinforce a weak factor pointing in the same direction. So, for instance, the greater the intrusion on local government, the more substantial the federal claim should be. It seems at least doubtful that an intrusion such as the consent decree here could be supported where the Supreme Court has found two of the federal statutory provisions inadequate to ground a § 1983 claim—unless the remaining statutory clauses can be successfully distinguished.

Because the district court failed to consider the impact of *Gibbs* step 2 factors—particularly considerations of comity—on its exercise of jurisdiction, we remand the case with instructions on how to proceed. Cf. *Webb v. Bladen,* 480 F.2d 306, 309–10 (4th Cir.1973) (remanding case for *Gibbs* step 2 analysis where the district court failed to recognize that it had discretion under *Gibbs* to hear pendent claims and erroneously thought it was required to dismiss state claims for lack of jurisdiction).

*Further Considerations on Remand*

Any specific provision of the consent decree that can be grounded in what the court concludes is a winning federal claim should of course be preserved.[9] The parties here have

---

**8.** See also *Evans v. City of Chicago,* 10 F.3d 474 (7th Cir.1993) (en banc). Although *Evans* involved a pure "municipal corporation", the city of Chicago, the court recognized the force of comity principles even as to political entities not covered by the Eleventh Amendment. When making inquiries into jurisdictional support for a consent decree, "courts are bound by principles of federalism (and by the fundamental differences between judicial and political branches of government) to preserve the maximum leeway for democratic governance." *Id.* at 479.

The dissent appears to suppose that we rely on the Eleventh Amendment. Dissent at 578–579. If for some reason the paragraphs above leave any doubt on the subject, No, we do not; we rely primarily on circuit precedent affording a similar (and doubtless weaker) comity to the District of Columbia, with support from other circuits recognizing the role of comity where it was not (or was perceived as not) mandated by *Pennhurst II*.

**9.** We express no opinion as to the merits of the district court's original finding that the post-custody children have valid constitutional claims under the dictum of *DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 201 n. 9, 109 S.Ct. 998, 1006 n. 9, 103 L.Ed.2d 249 (1989) ("Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect."). If the district court does reach the issue on remand and adheres to its ruling, it should consider the possibility of bifurcating the class, since in-custody plaintiffs raise issues distinct from those who rely entirely on federal and local statutes.

We note in this connection that although courts ordinarily refrain from deciding constitutional questions when a case can be resolved on the basis of state law, see *Ashwander v. TVA,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 191, 29 S.Ct. 451, 454, 53 L.Ed. 753 (1909), *Pennhurst II* "had the effect of overruling the entire history of *Siler/Ashwander* doctrine in cases where injunctive relief is requested against the state." *Cuesnongle v. Ramos,* 835 F.2d 1486, 1497 (1st Cir.1987) (citing *Pennhurst II,* 465 U.S. at 123, 104 S.Ct. at 920 (majority opinion); 465 U.S. at 159–63, 104 S.Ct. at 939–42 (Stevens, J., dissenting)). The comity afforded the District under *Grano v. Barry* in the application of *Gibbs* step 2, paralleling the rule of *Pennhurst II,* similarly implies that the district court may not exercise jurisdiction over the pendent claims merely to avoid confronting the reverse-*DeShaney* issue. Of course *Ashwander* would under no circum-

not briefed the precise impact of *Suter* on each of the various sections of the federal statutes at issue. Accordingly, we remand the case to the district court to make that inquiry in the first instance, in order to determine which, if any, federal grounds survive that could support an injunction. We note that at a minimum, the "reasonable efforts" clause of the Adoption Assistance Act, § 671(a)(15), relied on heavily by the district court, see 762 F.Supp. at 961, 970, 980, 986, and § 671(a)(9), related to its findings at *id.* at 986, are no longer enforceable under the express holding of *Suter. See* 503 U.S. at 359 n. 10, 364, 112 S.Ct. at 1368 n. 10, 1370.

Ancillary mandates may be appropriate under the court's equitable jurisdiction, but only to the extent shown necessary to remedy violations that any decree properly addresses under the above standards. See *Missouri v. Jenkins,* — U.S. —, —, 115 S.Ct. 2038, 2056, 132 L.Ed.2d 63 (1995) ("[T]he remedial quality education program should be tailored to remedy the injuries suffered by the victims of prior *de jure* segregation. . . . On remand, the District Court must bear in mind that its end purpose is not only 'to remedy the violation' to the extent practicable, but also 'to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.' ") (citations omitted); *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) ("[T]he nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. . . . [T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.") (citations omitted). Specific provisions that cannot be supported on any of the above bases should be excised from the decree.

■ Plaintiffs cite *Local No. 93 v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), for the proposition that defendants may and should be held to the provisions of the consent decree, even though those provisions exceed what the law re-

quires. But as we explain in more detail below, the District, like defendants in *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), consented to the provisions of the decree only to the extent that they were necessary to remedy legal violations and has consistently objected to being subjected to more demanding standards. In *Local No. 93,* by contrast, the defendant city voluntarily accepted and continued to embrace extra obligations, to which only third parties objected. Compare *Rufo,* 502 U.S. at 389, 112 S.Ct. at 762–63 ("Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated. . . . [M]isunderstanding of the law could form a basis for modification. In this connection, we note again that the decree itself recited that it 'sets forth a program which is both constitutionally adequate and constitutionally *required.*' ") (citations omitted).

\* \* \*

The district court will confront a number of other issues on remand that the parties have adequately briefed and on which we offer the following guidance.

■ First, plaintiffs suggest that § XXII(C) forecloses termination of the consent decree, because it calls for termination only on the occurrence of an event—vacation of the district court's original merits opinion in its entirety—that has not taken place. There are a number of flaws in this contention. First, § XXII(C) clearly contemplates partial relief calibrated to partial failure of the grounds on which the district court acted. The consent decree thus does not represent a "compromise [on] genuine uncertainties", *Evans v. City of Chicago,* 10 F.3d 474, 478–79 (7th Cir.1993) (en banc), but rather a knuckling under to the district court's legal conclusions, contingent on those conclusions being upheld on appeal. The decree specifies that "portions of this Order . . . that are directly based on [any] part of the Memorandum Opinion that is vacated shall be null and void." In a literal sense, of course, even the

stances suggest any need to refrain from addressing the issues of federal statutory law.

partial condition never had any serious possibility of being fulfilled, for appellate courts rarely vacate district court *opinions* as opposed to *judgments*. But the parties plainly did not bargain for so hypertechnical a reading. Rather, since the provisions of the consent decree were negotiated as responses to specific findings of violations, the parties clearly anticipated that any undermining of those findings would require that the District be freed of the affected provisions. In effect, § XXII(C) is congruent with the lessons of *Pennhurst II*—that major changes in federal law may have the effect of undermining the jurisdictional basis of a continuing decree that is based only on local law. Accordingly, § XXII(C) cannot be read to preclude a consideration of *Suter*'s impact on the decree's legal foundation.

■ Resting heavily on their contrary reading of § XXII(C), plaintiffs object that defendants failed to move below for modification of the consent decree. Although the defendants did not specifically invoke Fed. R.Civ.P. 60(b)(5), authorizing relief when "it is no longer equitable that the judgment should have prospective application", they indisputably sought relief on the grounds that *Suter* had eroded the basis for the decree, see Defendants' Memorandum on Remand at 4 & n. 1 (Oct. 20, 1993), and the district court's orders recognize as much, see, e.g., Order of Nov. 12, 1993, at 1 (referring to defendants' requests that it "vacate or substantially modify the remedial order").[10] Even apart from § XXII(C), modification of a consent decree under Rule 60(b)(5) would proceed under "a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Rufo*, 502 U.S. at 381, 112 S.Ct. at 759 (citations omitted). See also *Evans*, 10 F.3d at 480, 477 (finding that any continued enforcement of a consent decree entered into by the City of Chicago had become "'inequitable' within the meaning of Rule 60(b)(5)" where the federal grounds had

all been found wanting and continuing supervision would burden the district court and entangle it in the operations of "another sovereign"); *Sweeton v. Brown*, 27 F.3d 1162 (6th Cir.1994) (en banc) (similar).

Second, plaintiffs contend that insofar as *Suter* may draw in question the district court's conclusion that the two federal statutes create rights enforceable under § 1983, Congress has reversed it. They point to the following 1994 enactment:

> In an action brought to enforce a provision of the Social Security Act, such provision is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.* [503 U.S. 347], 112 S.Ct. 1360 [118 L.Ed.2d 1] (1992), but not applied in prior Supreme Court decisions respecting such enforceability; *Provided, however,* that this section is not intended to alter the holding in *Suter v. Artist M.* that section [671(a)(15)] of the Act is not enforceable in a private right of action.

Social Security Act Amendments of 1994, Pub.L. No. 103–432, § 211, 108 Stat. 4398, 4460 (Oct. 31, 1994) (to be codified at 42 U.S.C. § 1320a–2); see also Improving America's Schools Act of 1994, Pub.L. No. 103–382, § 555, 108 Stat. 3518, 4057–58 (Oct. 20, 1994) (enacting the same language). Defendants respond that this instruction about "how to go about construing legislation enacted by other Congresses . . . impermissibly intrudes on the judicial power." Reply Br. at 22. We see no need to evaluate defendants' constitutional argument, because we cannot see that the "instruction" bears on the interpretive issues before the district court.

■ Contrary to the assumptions of plaintiffs' (and the dissent's) arguments, *Su-*

---

**10.** Even if the defendants had not sought relief on these grounds, we would still be required to investigate the basis of the district court's jurisdiction on our own initiative. See *Minker v.*

*Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1361 (D.C.Cir.1990); *Maguire v. Marquette University,* 814 F.2d 1213, 1218 & n. 4 (7th Cir.1987).

*ter* did not find provisions of the Adoption Assistance Act unenforceable "because of . . . inclusion in a section of [the Act] requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a–2. Rather, as we read *Suter*, its holding was based on the combination of (1) the *Pennhurst I* requirement of a clear statement for any conditions on state receipt of federal grants, see 503 U.S. at 356, 112 S.Ct. at 1366, (2) the absence of "statutory guidance . . . as to how 'reasonable efforts' are to be measured", *id.* at 360, 112 S.Ct. at 1368, and (3) the establishment of an alternative enforcement mechanism, see *id.* at 360–61, 112 S.Ct. at 1368–69. The discussion of the section's being embedded in the requirements for a state plan, *id.* at 358, 112 S.Ct. at 1367, seems largely a way station to the point that alternative means of enforcement are provided. The *Suter* Court's principal concern was the Act's vagueness. In discussing the "reasonable efforts" clause, § 671(a)(15) (state must make "reasonable efforts" to prevent need for removing child from his home and to return child to home after removal), the Court noted: "How the State was to comply with this directive, *and with the other provisions of the Act,* was, within broad limits, left up to the State." 503 U.S. at 360, 112 S.Ct. at 1368 (emphasis added).

This interpretation of *Suter* corresponds with the ordinary inquiry as to whether to infer a private right of action from a statutory scheme, see, e.g., *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and has been endorsed by other circuits as well. See, e.g., *Marshall v. Switzer,* 10 F.3d 925, 929 (2d Cir.1993) ("[T]he significant point in *Suter* was not that the statute in question only required a state to submit a plan to the federal agency but that the statute provided no guidance for measuring 'reasonable efforts.' "); *Wood v. Tompkins,* 33 F.3d 600, 605–06 n. 14 (6th Cir.1994) ("[T]he [*Suter* ] Court noted that other sections of the Adoption Act, in contrast to § 671(a)(15), did indeed impose precise requirements on the states in addition to requiring the mere sub-

mission of a plan. . . . [T]he holding is simply that the one particular provision that was at issue is too amorphous to confer enforceable rights."). Likewise, in *Doe v. District of Columbia,* Civ. No. 93–0092, slip op. at 17, 1994 WL 71547 (D.D.C. Feb. 25, 1994), the court found that a provision that had originally been relied on in this case, 42 U.S.C. § 5106a(b)(2) (a provision of the Child Abuse Prevention and Treatment Act), "invests only 'generalized dut[ies]' upon the states and does not 'unambiguously confer' an enforceable right to bring a private action against the government." The court at no point relied on Congress's having specified that the requirement should be embodied in a State plan.[11] Of course neither the Social Security Act of 1994 nor the identical language of the Improving America's Schools Act of 1994 did anything to supply more precise standards for the Adoption Assistance Act, or to alter the clear statement requirement or the Adoption Assistance Act's non-judicial enforcement provisions; it thus changed none of the factors on which the *Suter* Court's reasoning depended.

Congress may have been misled by the language of *Suter's* footnote 10, which says, after setting forth the language of § 671(a)(9), "As this subsection is merely another feature which the state plan must include to be approved by the Secretary, it does not afford a cause of action to the respondents anymore than does the 'reasonable efforts' clause of § 671(a)(15)." 503 U.S. at 359 n. 10, 112 S.Ct. at 1368 n. 10. In conjunction with the opinion's *text,* discussed above, we read the footnote to state essentially that the combination of factors noted above applies with equal force to § 671(a)(9).

The legislative history of the identical 1994 provisions suggests that Congress may also have been confused by *Suter's* statement that "the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features." 503 U.S. at 358, 112

---

11. We note that two district courts interpreting § 211 have deferred to the congressional view that inclusion in a plan was central to *Suter's* analysis—see *Jeanine B. v. Thompson,* 877

F.Supp. 1268, 1283 (E.D.Wis.1995); *Harris v. James,* 883 F.Supp. 1511, 1520 (M.D.Ala.1995)— but we disagree.

S.Ct. at 1367. See H.R.Conf.Rep. No. 213, 103d Cong., 1st Sess. 863 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1088, 1552 (quoting above sentence). The point of the sentence, however, is simply to distinguish what the statute specifically requires of states (adoption of a *plan* approved by the Secretary) from what—for the reasons given elsewhere in the opinion—it does not require. It certainly does not announce a general rule that mandatory inclusion in a plan demonstrates intent not to create an enforceable right.

The legislative history has another formulation of congressional purpose, but it is no more helpful than the reference to state plans. The Conference report stated that

> The intent of this provision is to assure that individuals who have been injured by a State's failure to comply with the Federal mandates of the State plan titles of the Social Security Act are able to seek *redress in the federal courts to the extent that they were able to prior to the decision in Suter v. Artist M.,* while also making clear that there is no intent to overturn or reject the determination in Suter that the reasonable efforts clause to Title IV–E does not provide a basis for a private right of action.

H.R.Conf.Rep. No. 761, 103d Cong., 2d Sess. 926 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2901, 3257 (emphasis added). But the Court decided *Suter* by applying previously established judicial criteria to a specific instance (§ 671(a)(15)) of a general question (whether Congress intended to create an enforceable right). The dissent in *Suter,* cited by the dissent here, was not correct in claiming that the Suter majority had "changed the rules of the game." 503 U.S. at 377, 112 S.Ct. at 1377 (Blackmun, J., dissenting). Even if Congress could wipe *Suter* from the books, we think that lower courts addressing the same issue would have no basis for assuming that, if once again confronted with a *Suter*-like issue, the Supreme Court would not do just what it did in *Suter.* Thus, unless § 211 actually changed part of the test that led to the outcome in *Suter* (which, as we have said, it did not), courts should find equally vague provisions of similar acts equally unenforcea-

ble for the reasons that the Court found convincing in *Suter.*

Nor does the second sentence of the 1994 amendments assist plaintiffs. It reads:

> This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by *overturning any such grounds applied in Suter v. Artist M. [503 U.S. 347], 112 S.Ct. 1360 [118 L.Ed.2d 1] (1992), but not applied in prior Supreme Court decisions respecting such enforceability; Provided, however,* that this section is not intended to alter the holding in *Suter v. Artist M.* that section [671(a)(15) ] of [the Act] is not enforceable in a private right of action.

(Emphasis added.) But Congress identified no "grounds" applied in *Suter* that were "not applied in prior Supreme Court decisions respecting ... enforceability." Thus the sentence has no effect on the interpretive issues raised by the Adoption Assistance Act.

\* \* \*

After what may seem a long journey, the core of our conclusion is no more than that we take seriously the Supreme Court's statement in *Gibbs* that "the issue whether pendent jurisdiction has properly been assumed is one which remains open throughout the litigation." 383 U.S. at 727, 86 S.Ct. at 1139. When a Supreme Court decision such as *Suter* flatly removes some of the supports of pendent jurisdiction, and at a minimum enfeebles most of the others, the "open" issue must be reexamined. To that end, we remand the case to the district court.

*So ordered.*

RANDOLPH, Circuit Judge, *dissenting:*

To paraphrase Edward R. Murrow, anyone who isn't confused by the majority opinion doesn't really understand it.

After six years of litigation, after a trial and a decision of this court sustaining the district court's jurisdiction, after further proceedings on remand, after an order finding the District of Columbia in contempt and the appointment of a receiver, after all this— *voilà*—my two colleagues spot a "jurisdictional" flaw in the case, a flaw everyone else

must have overlooked. Of course, they have discovered no such thing. The supposed defect identified in the majority opinion is not of the jurisdictional variety, and the issue the majority opinion addresses is hardly new—this court decided it two years ago when the District first appealed. *LaShawn A. ex rel. Moore v. Kelly,* 990 F.2d 1319 (D.C.Cir.1993) ("*LaShawn I*"). The District sought rehearing from that decision. The court denied the petition. The District suggested rehearing *en banc.* It did not get the votes. Now my colleagues, forgetting that two judges do not an *en banc* court make, reverse the first panel's ruling. That is, to say the least, an extraordinary result, and so are the reasons given for it. The majority opinion tosses aside settled law, turns its back on Supreme Court decisions, disregards the controlling precedents of this court, rewrites the holdings of other courts, and badly misreads a federal statute.[1]

## I

Inconsistency is the antithesis of the rule of law. For judges, the most basic principle of jurisprudence is that " 'we must act alike in all cases of like nature.' "[2] This is an old idea, and it has given rise to two time-honored doctrines of importance to this case. First, the *same issue* presented in a *later case* in the *same court* should lead to the *same result.* Second, the *same issue* presented a second time in the *same case* in the *same court* should lead to the *same result.* For three-judge panels in the federal courts of appeals, the first proposition reflects a variant of *stare decisis,* which I shall call the law-of-the-circuit doctrine. The second embodies the law-of-the-case doctrine. The majority opinion violates both.

The law-of-the-circuit doctrine is derived from legislation and from the structure of the federal courts of appeals. Courts of appeals sit in panels, or divisions, of "not more than three judges" pursuant to the authority granted in 28 U.S.C. § 46(c). The "decision of a division" is "the decision of the court." Revision Notes to 28 U.S.C. § 46 (citing *Textile Mills Securities Corp. v. Commissioner of Internal Revenue,* 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249 (1941)); *see Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871, 876 (D.C.Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993). Were matters otherwise, the finality of our appellate decisions would yield to constant conflicts within the circuit. 314 U.S. at 335, 62 S.Ct. at 277–78. One three-judge panel, therefore, does not have the authority to overrule another three-judge panel of the court. *E.g., United States v. Caldwell,* 543 F.2d 1333, 1370 n. 19 (D.C.Cir.1974), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). That power may be exercised only by the full court, either through an *en banc* decision, *id.,* or pursuant to the more informal, and dubious, practice adopted in *Irons v. Diamond,* 670 F.2d 265, 268 n. 11 (D.C.Cir.1981). While the law-of-the-case doctrine allows for certain exceptions—although not, to be sure, the one the majority invents today—the law-of-the-circuit doctrine does not. Thus, in circuits such as ours, where both doctrines are at work, the more exacting law-of-the-circuit doctrine supplants the law-of-the-case doctrine when panels hear multiple appeals from a single case. *See, e.g., United States v. 162.20 Acres of Land,* 733 F.2d 377, 379 (5th Cir.1984) (explaining that when a prior panel in the same circuit has decided an issue, law-of-the-circuit doctrine supplants law-of-the-case doctrine and precludes reconsideration of that decision in a subsequent appeal, even if the second panel believes the first was wrong), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 920 (1985); *cf. Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1077 (D.C.Cir. 1984) (holding that both the law of the case and the law of the circuit precluded a panel from reconsidering issues resolved in a prior appeal in the same case), *cert. denied,* 469

---

1. For those unacquainted with this class action, I offer a brief history in an addendum to this opinion.

2. *Ward v. James,* [1966] 1 Q.B. 273, 294 (C.A.) (quoting Lord Mansfield in John Wilkes' case, *Rex v. Wilkes,* 98 Eng.Rep. 327, 335 (1770)). *See* Henry J. Friendly, *Indiscretion About Discretion,* 31 Emory L.J. 747, 758 (1982).

U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985).

Until today, the law-of-the-circuit doctrine was completely settled, thoroughly understood and uniformly honored—by the two judges in the majority and the other judges of this court. *See, e.g., Ayuda v. Thornburgh,* 919 F.2d 153, 154 (D.C.Cir.1990) (Henderson, J., concurring); *Air Line Pilots Ass'n Int'l v. Eastern Air Lines, Inc.,* 863 F.2d 891, 930 (D.C.Cir.1988) (Williams, J., concurring in denial of rehearing *en banc* ), *cert. dismissed,* 501 U.S. 1283, 112 S.Ct. 38, 115 L.Ed.2d 1119 (1991). Likewise, the district judges in this circuit have rightly assumed that a decision of one panel of this court represents the law of the circuit. *See, e.g., Feeling v. Kelly,* 152 F.R.D. 670, 673 (D.D.C.1994) (relying upon *LaShawn I* to sustain the district court's pendent jurisdiction).

Now things have changed. My two colleagues must admit—and do admit, although rather grudgingly—that they are today overruling the panel's decision in *LaShawn I.* This is beyond dispute. The question the majority opinion addresses is a question *LaShawn I* answered and answered in a way directly contrary to the majority's disposition. *LaShawn I* explained that the District of Columbia's statutory and regulatory scheme was "appropriately before us under our pendent jurisdiction," 990 F.2d at 1324; held that federal judicial authority to decide the case on pendent grounds was "incontrovertible," *id.* at 1326; and affirmed the district court's exercise of that authority by confirming its decision "entirely on the basis of local law," *id.* To put the matter starkly, the first panel—consisting of then-Chief Judge Mikva, Judge Sentelle and myself—directed the district judge not to consider federal claims and to revise the decree accordingly; a majority of the second panel—consisting of Judge Williams and Judge Henderson—now directs the district judge to consider federal claims and modify the decree accordingly. This is more than mere inconsistency. It is flat contradiction, and—because we are *one* court—it is self-contradiction.

## II

Perhaps I should end on this note. But so much else is wrong with what the majority has written that I think it appropriate to say more. Apart from the law-of-the-circuit doctrine, the law of the case foreclosed reopening the question my colleagues address, and the clear dictates of the Supreme Court, the Congress, and the Constitution should have steered them away from the conclusions they reach.

## A

"When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court." *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 739 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 180, —— L.Ed.2d —— (1995); *see also Northwestern Ind. Tel. Co. v. FCC,* 872 F.2d 465, 471 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990). The Supreme Court has instructed the lower courts to be "loathe" to reconsider issues already decided "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983)). My colleagues identify no such "extraordinary circumstance" here. They can point to no intervening change in controlling legal authority. *See McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 350 (D.C.Cir.1995). They do not claim that *LaShawn I* was "clearly erroneous" or that it "would work a manifest injustice." *See Christianson,* 486 U.S. at 817, 108 S.Ct. at 2178.

Instead, my colleagues invent for themselves an exception to the law-of-the-case doctrine under which a subsequent panel is free to reexamine any "jurisdictional" question decided, but not extensively discussed, by an earlier panel in an earlier appeal of the same case. This invention is no doubt convenient as my colleagues struggle to reach the

result they want here. Unfortunately, it also contradicts both the Supreme Court's 1988 decision in *Christianson v. Colt Industries Operating Corp.* and our own very recent decision in *Crocker v. Piedmont Aviation, Inc.*

First, those decisions make clear that it is of no moment that the three-judge panel in *LaShawn I* devoted little space to the topic that now grabs the attention of two of my other colleagues. As the Supreme Court held in *Christianson,* the law-of-the-case doctrine turns "on whether a court previously decide[d] upon a rule of law ... not whether, or how well, it explained the decision." 486 U.S. at 817, 108 S.Ct. at 2178 (internal quotation marks omitted). And in *Crocker,* 49 F.3d at 739, we held that the law-of-the-case doctrine applies to questions decided "explicitly or by necessary implication." The majority admits as much (maj. op. at 560), but then argues that the issues "most strongly inviting a relaxed application of law of the case are those that the prior decision never explicitly confronted" (maj. op. at 562). This is doubly wrong. It misstates *LaShawn I* and it misstates the law. While *LaShawn I* did not provide a detailed analysis of *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), doubtless because the District did not rest its appeal on any supposed lack of pendent jurisdiction, the law-of-the-case doctrine depends not on how extensively the earlier panel discussed the particular issue, but on whether it decided it, as *LaShawn I* assuredly did.

Second, the Supreme Court in *Christianson* specifically rejected the "jurisdictional question" exception the majority manufactures for this case. The Court there said that the law-of-the-case doctrine prohibits a federal court from revisiting another federal court's decision to transfer a case to it so long as the transferee court finds the transfer decision "plausible." 486 U.S. at 819, 108 S.Ct. at 2179. The Court explained:

> There is no reason to apply law-of-the-case principles less rigorously to transfer deci-

sions that implicate the transferee's jurisdiction. Perpetual litigation of any issue—jurisdictional or nonjurisdictional—delays, and therefore threatens to deny, justice. *Id.* at 816–17 n. 5, 108 S.Ct. at 2178 n. 5. In reaching that conclusion, the Court rejected *Potomac Passengers Ass'n v. Chesapeake & Ohio Ry. Co.,* 520 F.2d 91, 95 n. 22 (D.C.Cir. 1975), in which this court first suggested that the law-of-the-case doctrine might not preclude reconsideration of jurisdictional questions. *Id.* The majority acknowledges the Supreme Court's rejection of *Potomac Passengers,* but then inexplicably ignores it. It is true, as the majority states, that *Potomac Passengers* was "widely cited for the proposition that jurisdictional questions are relatively unrestrained by law of the case" (maj. op. at 560), but that was *before Christianson.* In the seven years since *Christianson,* only two federal courts have even mentioned *Potomac Passengers,* and then only to bolster the unremarkable conclusion that a district court is free to reconsider its own non-final jurisdictional decisions. *Matek v. Murat,* 862 F.2d 720, 724 n. 1 (9th Cir.1988); *Travelers Indem. Co. v. Household Int'l, Inc.,* 775 F.Supp. 518, 530 (D.Conn.1991).[3] The majority cites no case since *Christianson* in which a federal appellate court has reversed a jurisdictional decision made by a prior merits panel. Today, of course, this court and other courts of appeals routinely apply law-of-the-case preclusion to questions of jurisdiction, *see, e.g., McKesson Corp.,* 52 F.3d at 350; *Oneida Indian Nation of New York v. State of New York,* 860 F.2d 1145, 1151 (2d Cir. 1988), *cert. denied,* 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989), and do so even when the first decision regarding jurisdiction is less than explicit. *See, e.g., In re Memorial Estates, Inc.,* 950 F.2d 1364, 1367 (7th Cir.1991), *cert. denied,* 504 U.S. 986, 112 S.Ct. 2969, 119 L.Ed.2d 589 (1992).

So where does the majority derive the inspiration for its invention? Hunting far and wide for something, anything, to counteract the force of *Christianson* and *Crocker,* the majority comes up with a strange source

---

**3.** *DiLaura v. Power Authority of the State of New York,* 982 F.2d 73, 76–77 (2d Cir.1992), the only other post-*Christianson* decision the majority cites in support of its law-of-the-case exception, also concerns only the authority of a district court to alter its non-final decisions.

of support—*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (*"Pennhurst II"*). No matter that *Pennhurst II* decided nothing about the law-of-the-case doctrine, in fact did not even mention it. It is enough for the majority that the Supreme Court said in *Pennhurst II* that it does not consider itself bound by decisions on questions of jurisdiction made *sub silentio* in previous cases "when a subsequent case finally brings the jurisdictional issue" to the Court. 465 U.S. at 119, 104 S.Ct. at 918 (internal quotation marks and citation omitted). But that plainly has nothing to do with this appeal. The cited portion of *Pennhurst II* dealt with the *stare decisis* effect of decisions in *other* cases, not the effect of earlier decisions by the same appellate court in the *same* case.

It would take a mighty leap to get from *Pennhurst II* to the majority's newly-coined rule that an appellate court may freely revisit jurisdictional questions it decided in an earlier appeal of the same case. My colleagues make the attempt, but predictably fall well short. While acknowledging that the Supreme Court never addressed the law-of-the-case doctrine in *Pennhurst II* (maj. op. at 562), they declare—here comes the jump—that the Court "acted" as if the majority's new law-of-the-case exception already existed (maj. op. at 562). The majority's theory has two flaws, both fatal. First, the Supreme Court had no reason to "act" as if the majority's new law-of-the-case exception already existed in *Pennhurst II* because there was no law-of-the-case issue there at all.[4] Second, regardless of how the majority thinks the Supreme Court "acted" in *Pennhurst II,* the Court clearly rejected the majority's "jurisdictional question" exception four years later in *Christianson.*

4. In *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (*"Pennhurst I"*), the Court eliminated one federal basis for a consent decree, then remanded the case to the court of appeals to determine if state law or federal constitutional or statutory grounds could support the decree. *Id.* at 31, 101 S.Ct. at 1547. *Pennhurst I* did not decide whether the Eleventh Amendment would bar a federal court from granting relief against a state on pendent state-law claims. Rather, in directing

B

Even if my colleagues were free to create an exception to the law-of-the-case doctrine for "jurisdictional questions," they still would face a major problem here: the application of *Gibbs* step two is not, as they claim, "jurisdictional," *see* (maj. op. at 563). It becomes "jurisdictional" in my colleagues' eyes only because they must see it this way. Otherwise, there is no explaining why they ignore the law of the case and take it upon themselves to reexamine this court's earlier holding in *LaShawn I.* And so they form a perfect circle: *Gibbs* step two is jurisdictional because it requires continuous reexamination (maj. op. at 562), and it requires continuous reexamination because it is jurisdictional (maj. op. at 564). There is, however, a rub— the Supreme Court and the lower federal courts have uniformly recognized that the second step of the *Gibbs* analysis is decidedly not jurisdictional. The matter is discretionary. Here the discretion had already been exercised—in *LaShawn I*—in favor of resolving the case entirely on pendent local law grounds.

Obviously, the concept of pendent jurisdiction entails a jurisdictional element, but that is comprised in the first step of the *Gibbs* analysis. *See Wal–Juice Bar, Inc. v. Elliott,* 899 F.2d 1502, 1503 (6th Cir.1990); *District of Columbia Common Cause v. District of Columbia,* 858 F.2d 1, 10 (D.C.Cir.1988); *Dimond v. District of Columbia,* 792 F.2d 179, 188 (D.C.Cir.1986); *Financial Gen. Bankshares, Inc. v. Metzger,* 680 F.2d 768, 772 (D.C.Cir.1982). Step one of *Gibbs* deals with the court's "power" to hear pendent local law claims—its jurisdiction—when the case raises a "substantial" federal issue and the federal and local law claims "derive from a common nucleus of operative fact" and "are such that [the plaintiff] would ordinarily be ex-

the court of appeals to consider *whether* state law could support the decree, the Court directed the court of appeals to consider that question. Only after the court of appeals held on remand that state law alone was sufficient to support the order, 673 F.2d 647 (3d Cir.1982) (*en banc* ), did the Supreme Court squarely confront the Eleventh Amendment question. Since the Court had not faced the question before *Pennhurst II,* it had not established any law of the case to apply.

pected to try them all in one proceeding." *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. The federal courts' subject matter jurisdiction, to the extent Congress authorizes it, is derived directly from Article III, Section 2, extending the judicial "Power" to "all Cases in Law and Equity arising under this Constitution, the Laws of the United States...." U.S. CONST. art. III, § 2; *see also Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 807, 106 S.Ct. 3229, 3231, 92 L.Ed.2d 650 (1986); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 395–96, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980). The doctrine of pendent jurisdiction rests on the idea that the court's jurisdiction over the underlying federal claim brings the related pendent claims under the scope of Article III because they are part of the same "case" or "controversy." *See Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138; *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 821–23, 6 L.Ed. 204 (1824). *Gibbs'* requirements of a substantial federal claim, a common nucleus of operative fact, and the expectation of one trial, 383 U.S. at 725, 86 S.Ct. at 1138, "serve[ ] as an operational definition of the 'one constitutional "case" ' language." Richard A. Matasar, *Rediscovering "One Constitutional Case": Procedural Rules and the Rejection of the* Gibbs *Test for Supplemental Jurisdiction*, 71 CAL.L.REV. 1399, 1416 (1983).

There can be not the slightest doubt here that the children's claims under federal statutory law, the Constitution, and District of Columbia law all arise from a common set of facts. The district court's jurisdiction—its power—to decide the local law claims thus turned on the substantiality of the underlying federal claims. Whether a court may decide pendent claims is determined on the face of the pleadings. Contrary to what the majority tells us, the ultimate disposition of the federal claim is "immaterial on the question of power." 13B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER,

FEDERAL PRACTICE AND PROCEDURE § 3567.1, at 114–15 (1995).

Once a district court finds a substantial federal claim, it has jurisdiction over the entire case. The court then must engage in the second step of the *Gibbs* analysis and decide whether to exercise that jurisdiction over the local or state law claims. This aspect of *Gibbs*—the so-called "key issue" according to my colleagues—is not a jurisdictional determination. It is an entirely prudential one, which is why *Gibbs* held that "pendent jurisdiction is a doctrine of discretion...." 383 U.S. at 726, 86 S.Ct. at 1139.[5] To reach a contrary conclusion, the majority must misconstrue a decision of the Seventh Circuit and then completely mischaracterize a decision of this circuit. In *Maguire v. Marquette University*, 814 F.2d 1213 (7th Cir.1987), the Seventh Circuit did not, as the majority claims, call the *Gibbs* step two analysis jurisdictional. *See* maj. op. at 563. It applied that label only to the *Gibbs* "rule" that "if the federal claims are dismissed before trial ... the state claims should be dismissed as well." *See Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. The majority's mischaracterization of this court's decision in *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C.Cir.1990), is far worse. The majority insinuates that the *Minker* court called *Gibbs* step two a "jurisdictional question." Maj. op. at 564. It did no such thing. In *Minker*, this court said, "Our holding raises a new jurisdictional question on remand." 894 F.2d at 1361. The new question left "on remand" was not a *Gibbs* question—this court handled that one itself—but rather was whether the plaintiff had sufficiently pled diversity to provide an independent basis of jurisdiction over his state-law claim. 894 F.2d at 1361. That is a jurisdictional question all right, but it is not *Gibbs* step two.

---

**5.** While it is true that the Supreme Court in *Gibbs* explained that the step two question remains open through "the litigation," the Court meant only that the question need not be decided forever on the pleadings, but could be reconsidered during pretrial proceedings or even the trial itself. *See Gibbs*, 383 U.S. at 727, 86 S.Ct. at

1139. While it may be true that a district court can relinquish its pendent jurisdiction even after trial, *see* (maj. op. at 563), the majority has identified no case in which that question was revisited after a trial, an appeal, a remand, and another appeal.

Despite my colleagues' best efforts, then, *Gibbs* step two remains not a "jurisdictional inquiry," [6] but a prudential determination left to the discretion of the court that makes it. There is no other way to explain *Schmidt v. Oakland Unified School District*, 457 U.S. 594, 595, 102 S.Ct. 2612, 2612, 73 L.Ed.2d 245 (1982), in which the Supreme Court held that a federal court's decision whether to resolve pendent local law claims was to be reviewed for abuse of discretion. *See also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265–66 (D.C.Cir.1995) (Williams, J.) ("Whether actually to decide [the local-law claims] is a matter left to the sound discretion of the district court.... We review for abuse of discretion.").

The majority purports to apply that standard here, apparently concluding that the district court abused its discretion in "fail[ing] to consider the impact of *Gibbs* step 2 factors—particularly considerations of comity—on its exercise of jurisdiction...." Maj. op. at 566. What discretion? The district court did not address *Gibbs* step two on remand and for good reason: this court already had done so. *See LaShawn I*, 990 F.2d at 1326. The district court, in other words, had no discretion to abuse. It was bound by the holding in *LaShawn I. See In re Ivan F. Boesky Securities Litigation*, 957

F.2d 65, 68 (2d Cir.1992) (explaining that the law-of-the-case doctrine leaves a district court "no discretion" in carrying out an appellate court's directions on remand). If we suppose that the district court abused its discretion in complying with our ruling in *LaShawn I*, what, according to the majority, should the district court have done?

### III

The majority's handiwork thus far ought to be enough to leave the district judge thoroughly confused, but my colleagues are not finished yet. For the remand, they direct the district court to apply an entirely new set of pendent jurisdiction rules and then to ignore the clear direction of Congress in interpreting the federal statutory scheme at the center of this case.

### A

On remand, the majority declares, the district court must "examine[ ] the validity of the federal claims" and determine whether "any federal grounds survive that could support an injunction." Maj. op. at 558, 567.[7] This direction happens to conflict directly with *Rosado v. Wyman*, 397 U.S. 397, 405, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970), which is relegated to a footnote in the major-

6. Congress has also explicitly recognized the discretionary nature of the second step of the *Gibbs* inquiry. The Judicial Improvement Act, enacted in 1990 and codified in part at 28 U.S.C. § 1367, states:

> ... in any civil action of which the district courts have original jurisdiction, the district courts *shall* have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a) (italics added). When the federal claim drops out, the district court has discretion to retain or dismiss the pendent local law claims: "The district courts *may* decline to exercise supplemental jurisdiction over a claim in subsection (a)" for any of the reasons listed in § 1367(c)(1)–(4). 28 U.S.C. § 1367(c) (italics added).

The majority passes over § 1367 because this case began before the statute's effective date (maj. op. at 562 n. 3). But in attaching their jurisdictional label to *Gibbs* step two, my colleagues should have paused to consider that

§ 1367 "codified the doctrine of pendent jurisdiction developed by the Supreme Court in the case of *United Mine Workers of America v. Gibbs*, 383 U.S. 715 [86 S.Ct. 1130, 16 L.Ed.2d 218] (1966), and its progeny." *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir.1995); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1266 (D.C.Cir.1995). (The statute also did a good deal more by allowing the federal courts to exercise jurisdiction over pendent parties, *cf. Finley v. United States*, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), as distinguished from pendent claims. *See* David D. Siegel, Practice Commentary, 28 U.S.C.A. § 1367; FEDERAL COURTS STUDY COMMITTEE, REPORT OF THE FEDERAL COURTS STUDY COMMITTEE, PART III, at 546–68 (Apr. 2, 1990 & July 1, 1990).)

7. It is a mystery to me why the majority assigns this task to the district court, rather than to itself. The questions posed are questions of law, and this court is in as good a position to decide them as the district court. The majority's assignment sets the stage for yet another appeal, and the district judge must be as baffled as I am by this court's conflicting commands.

ity opinion. In *Rosado v. Wyman,* the Supreme Court roundly rejected the idea that "once a federal court loses power over the jurisdiction-conferring claim, it may not consider a pendent claim." 397 U.S. at 404, 90 S.Ct. at 1213. Just as a federal court does not lose jurisdiction over a diversity action if one of the parties moves while the appeal is pending, a federal court does not lose pendent jurisdiction over the local law claims if the federal claims are decided against the plaintiff or otherwise drop out of the case. *Id.* at 405 & n. 6, 90 S.Ct. at 1214 & n. 6. In the Supreme Court's words, *Rosado* holds that there is no requirement that a federal court have "jurisdiction over the primary claim at all stages of the litigation as a prerequisite to resolution of the pendent claim," *id.* at 405, 90 S.Ct. at 1214—a holding completely at odds with the majority's proposition that even now, after an extensive trial and two appeals, the pendent jurisdiction already exercised must be undone unless the plaintiffs' local law claims remain closely intertwined with "winning" federal claims. Under *Rosado,* even if the first panel had reversed the judgment to the extent the district court found the District in violation of federal law, pendent jurisdiction over the local law claims would still exist, and the extensive violations of local law would support the decree.

Having made a shambles of *Gibbs* step two and of *Rosado v. Wyman,* the majority lays waste to what remains of the law of pendent jurisdiction. Unlike plaintiffs in any other case ever decided by the federal courts, the plaintiffs here may retain their victory on their local law claims only if it turns out that they had "winning" federal claims. Maj. op. at 566. "Winning"? Where does this idea come from? *Gibbs* and the cases following it require only that the federal claim asserted in the complaint be "substantial," that is, that it "have substance sufficient to confer subject matter jurisdiction on the court," a principle derived from *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933). *Gibbs,* 383 U.S. at 725, 86 S.Ct. at 1138. According to *Levering,* "jurisdiction, *as distinguished from merits,* is wanting where the claim set forth in the pleading is plainly unsubstantial ... either because [it

is] obviously without merit, or 'because its unsoundness so clearly results from the previous decisions of [the Supreme] court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' " 289 U.S. at 105–06, 53 S.Ct. at 550 (italics added) (quoting *Hannis Distilling Co. v. Mayor of Baltimore,* 216 U.S. 285, 288, 30 S.Ct. 326, 327, 54 L.Ed. 482 (1910)). A federal question is therefore "substantial" for purposes of pendent jurisdiction if it is not "so attenuated and unsubstantial as to be absolutely devoid of merit," "wholly insubstantial," "obviously frivolous," or "no longer open to discussion." *Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974) (internal quotation marks and citations omitted); *see also District of Columbia Common Cause,* 858 F.2d at 10; *Town of W. Hartford v. Operation Rescue,* 991 F.2d 1039, 1049 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993); Matasar, *supra,* 71 CAL. L.REV. at 1419. The Court explained in *Hagans:* "The limiting words 'wholly' and 'obviously' have cogent legal significance.... [T]hose words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial...." 415 U.S. at 537–38, 94 S.Ct. at 1379.

In requiring the district court to find a "winning" federal claim as a prerequisite to exercising jurisdiction over pendent local law claims, my colleagues have thus overruled the Supreme Court's decisions in *Levering, Hagans,* and *Gibbs*—a tall order for two judges of an inferior federal court.

Given their treatment of Supreme Court precedents, it is little wonder that my colleagues also mow down two decisions of this court bearing directly on the issue they think needs deciding. In *District of Columbia Common Cause v. District of Columbia,* 858 F.2d at 10, we upheld solely on pendent local law grounds an injunction against the District of Columbia prohibiting it from spending public funds to oppose citizens' initiatives. Far from determining whether a winning

federal claim supported the injunction, we refused to decide the merits of the federal claim (much as did the panel in *LaShawn I*) because it was not "so attenuated and unsubstantial as to be absolutely devoid of merit," and was therefore substantial enough to support the pendent claims. *Id.* (citation omitted). *Dimond v. District of Columbia*, 792 F.2d 179 (D.C.Cir.1986), is to the same effect. We there reversed the district court's ruling that a District of Columbia statute violated federal law. Although the federal claim was a loser, we considered it "substantial enough" to allow us to exercise jurisdiction over the pendent local law claim and to decide it, which we did. 792 F.2d at 188.[8]

The majority ignores *Dimond* but attempts to distinguish *District of Columbia Common Cause* on the ground that the injunction there was somehow inoffensive to

the notion of "comity" the majority tries to fashion out of its favorite recurring *non sequitur*, *Pennhurst II*. Maj. op. at 565–66. *Pennhurst II* is an exceedingly odd, indeed astonishing, source for the majority's views on the comity this court owes local District of Columbia courts. Odd because *Pennhurst II* dealt with something no one would have dreamed this case involved—the Eleventh Amendment to the Constitution. Exceedingly odd because the Eleventh Amendment confers immunity on the states from certain suits in federal court, and when last I checked, the District of Columbia was not a state. Astonishing because the majority nonetheless finds that *Pennhurst II* and the Eleventh Amendment somehow "suggest that, in general, injunctions against nonfederal officials based on nonfederal law should be disfavored." Maj. op. at 564–65.

**8.** The majority relies on *Evans v. City of Chicago*, 10 F.3d 474 (7th Cir.1993) (en banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 1831, 128 L.Ed.2d 460 (1994) (*Evans III*), to support its conclusion that the second part of the *Gibbs* analysis is a jurisdictional inquiry. *Evans III* is not on point. The Seventh Circuit reached the result it did because no substantial claim *whatsoever*—federal or local—underlay the district court's order. *Evans III* does not even discuss the question of pendent jurisdiction, since the only local claims at issue there were part of the plaintiffs' constitutional due process theory. 10 F.3d at 476. A prior appellate panel, *Evans v. City of Chicago*, 873 F.2d 1007 (7th Cir.1989) (*Evans II*), rejected both of the plaintiffs' constitutional challenges to the City of Chicago's practice of paying some judgments earlier than others. That panel explicitly held that the City had not violated the Constitution's guarantee of equal protection, *id.* at 1015–18, and according to *Evans III*, there was "little doubt that *Evans II* would have repulsed a due process argument had the plaintiffs presented it for decision," 10 F.3d at 480–81. Given the absence of a substantial federal claim, the *Evans III* court held that the district court had no jurisdiction to enforce the consent decree. The "bare consent of the officeholder" was not a sufficient basis for imposing obligations on the City. *Id.* at 479.

Here, it is not the "bare consent" of the District that supports the consent decree. As this court held, the decree rests on the District's flagrant and repeated violations of District of Columbia law. *LaShawn I*, 990 F.2d at 1325. For purposes of this appeal, *Evans III* demonstrates, if anything, only that the first part of the *Gibbs* inquiry—the substantiality of the underlying federal claim—is jurisdictional.

Nor does *Angela R. ex rel. Hesselbein v. Clinton*, 999 F.2d 320 (8th Cir.1993), support the

majority's holding. In that case, as here, the federal claims against the governor of Arkansas and the director of the state's Department of Human Services were based in the Constitution, the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–628, 670–679, and the Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101–5106a. 999 F.2d at 322. The court recognized the uncertainty of the constitutional claims of those children not in foster care. Moreover, it noted that the analysis in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), "might ultimately compel the conclusion that the ... federal statutes upon which plaintiffs rely do not create an enforceable private right of action on their behalf." 999 F.2d at 323, 324. Nevertheless, because these questions went to the merits of the plaintiffs' claims and did not "inescapably render the claims frivolous," it held the district court clearly had jurisdiction to enter a consent decree resolving the dispute. *Id.* at 324 (internal quotation marks and citation omitted). Thus, as to the question whether the plaintiffs here have federal claims substantial enough to support the district court's exercising pendent jurisdiction over their local law claims, *Angela R.* supports a conclusion directly contrary to the majority's.

The problem in *Angela R.* was not jurisdictional, but centered on "future enforcement of [the] obligations" imposed by the decree. *Id.* The Eighth Circuit concluded that the consent decree did not resolve specifically enough how it was to be enforced, and that the district court therefore abused its discretion in approving it. *Id.* at 325. Because *Angela R.* was a suit against state officials, Eleventh Amendment concerns made it particularly important that the decree's enforcement provisions were consensual and plain. *Id.* at 325–26. Those concerns are not present here. *See infra* pp. 565–66.

It is hard to take this seriously. The Eleventh Amendment prohibits federal courts from entertaining "suit[s] in law or equity, commenced or prosecuted against *one of the United States.*" U.S. CONST. amend. XI (italics added). That eliminates the District of Columbia. I would have thought that judges in this circuit needed no reminding that the District is not a sovereign state, separate from the federal government. It is the seat of our national government, and it is subject to Congress' plenary authority under Article I, Section 8, Clause 17 of the Constitution.[9] *See Palmore v. United States,* 411 U.S. 389, 397, 93 S.Ct. 1670, 1676, 36 L.Ed.2d 342 (1973). Although inhabitants of the District today possess, to some degree, the power of self-government, District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973), they hold that power at Congress' forbearance, and it is far from absolute. Congress has "reserve[d] the right, at any time, to exercise its constitutional authority as legislature for the District, by enacting legislation for the District on any subject ... including legislation to amend or repeal any law in force in the District ... and any act passed by the [District] Council." *Id.* § 601. The District government must submit any law it enacts to Congress, which can disapprove the law within 30 days. *Id.* § 602(c)(1). The District may make no expenditures, even of funds it raises through its own means of revenue collection, unless approved by an act of Congress. *Id.* § 446.

The District is thus a distinctly federal entity, "truly *sui generis* in our governmental structure." *District of Columbia v. Carter,* 409 U.S. 418, 432, 93 S.Ct. 602, 610, 34

L.Ed.2d 613 (1973). A suit in federal court against a federal entity "is hardly the instrument of a distant, disconnected sovereign," *Hess v. Port Auth. Trans–Hudson Corp.,* ——— U.S. ———, ———, 115 S.Ct. 394, 401, 130 L.Ed.2d 245 (1994), and thus raises none of the concerns that underpin the Eleventh Amendment or the Supreme Court's application of it in *Pennhurst II.* Accordingly, the cases the majority cites concerning the comity owed states—*Angela R. ex rel. Hesselbein v. Clinton,* 999 F.2d 320 (8th Cir.1993), and *Evans v. Buchanan,* 468 F.Supp. 944 (D.Del. 1979)—are irrelevant here.[10]

Stripped of their faulty Eleventh Amendment underpinnings, my colleagues' views on the comity owed District of Columbia courts turn solely on their misunderstanding of the *Gibbs* step two analysis. The majority seems to think that the existence of local law claims automatically counsels against the exercise of jurisdiction over them. If that were true, pendent jurisdiction would never exist. But as this court has made clear, it is the extent to which a local law issue is "novel and unsettled"—and not its mere existence—that might counsel against the exercise of jurisdiction. *Compare Financial Gen. Bankshares, Inc. v. Metzger,* 680 F.2d 768, 775 (D.C.Cir.1982) (district court abused its discretion in exercising pendent jurisdiction over "novel and unsettled" local law issues) *and Grano v. Barry,* 733 F.2d 164, 169 (D.C.Cir.1984) (rejecting pendent jurisdiction over "novel and unsettled" local law issues) *with Dimond v. District of Columbia,* 792 F.2d at 189 (where local law issues were neither novel nor unsettled, uncertainty in local law could not weigh heavily against the exercise of pendent jurisdiction). The major-

9. For purposes of 42 U.S.C. § 1983, Congress has indicated that the District of Columbia should be treated as a municipal government. H.R.REP No. 548, 96th Cong., 1st Sess. 2 (1979). After noting that municipalities may be liable for § 1983 violations under *Monell v. City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the House report stated: "That decision leaves the District of Columbia government and its officers as the only persons in the United States or its territories who are not subject to Section 1983 liability." H.R.REP. No. 548, *supra,* at 2. By contrast, § 1983 does not abrogate the Eleventh Amendment immunity accorded to States. *Quern v. Jordan,* 440 U.S. 332, 340–41,

99 S.Ct. 1139, 1144–45, 59 L.Ed.2d 358 (1979); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam).

10. *Committee of Blind Vendors of the District of Columbia v. District of Columbia,* 28 F.3d 130 (D.C.Cir.1994), is likewise of little value here because it concerned not the comity federal courts owe District of Columbia courts, but the respect owed the District's administrative agencies in a statutory scheme in which Congress specifically said that the District of Columbia should be treated like a state. *See* 28 F.3d at 132 n. 1.

ity has identified no such "novel and unsettled" local law issues at stake here. To do so now, it would have to overrule yet another portion of *LaShawn I*, in which this court held that District of Columbia law clearly provides private causes of actions for all of the children in the plaintiff class. 990 F.2d at 1326.

### B

This brings me to the majority's treatment of *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), and the statute Congress passed in the wake of that decision.

*Suter* held that one of the provisions of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–627 and §§ 670–679 ("the Act"), upon which plaintiffs have relied, could not be enforced through a private cause of action. In light of the Court's holding with respect to that provision—42 U.S.C. § 671(a)(15)—the majority suggests that the substantiality of the federal claims asserted by those plaintiff children who are not in custody may be undermined because, in view of *Suter*, they may not be able to enforce any of the Act's provisions.[11] Maj. op. at 570. And so the majority instructs the district court, on remand, to consider the effect of *Suter*.

That instruction collides with 42 U.S.C. § 1320a–2, a 1994 statute severely limiting *Suter*. The statute provides:

> In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in *Suter v. Artist M.* [503 U.S. 347], 112 S.Ct. 1360 [118 L.Ed.2d 1] (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this sec-

tion is not intended to alter the holding in *Suter v. Artist M.* that section 671(a)(15) of this title is not enforceable in a private right of action.

*Id.* Theorizing that Congress may have been "misled" or "confused" by the language of *Suter* (maj. op. at 569–70), my colleagues essentially conclude that this statute has no effect at all. Maj. op. at 570. They claim that the first sentence of § 1320a–2 means nothing because *Suter* did not turn solely on the fact that the provision at issue was included in the state plan requirement. That point might be well taken, but what about the next sentence? There, Congress specifically directed the federal courts to use the same "grounds for determining the availability of private actions" they used before *Suter* and to disregard any new grounds the Supreme Court first applied in *Suter*. This direction may be understood only in light of the dissenting opinion in *Suter*, which claimed that the *Suter* majority had "changed the rules of the game" for finding private rights of action under § 1983. *See* 503 U.S. at 377, 112 S.Ct. at 1377 (Blackmun, J., dissenting). Rightly or wrongly, Congress credited the dissenters' view. "The intent of this provision," the Conferees stated, "is to assure that individuals who have been injured by a State's failure to comply with the Federal mandates of the State plan titles of the Social Security Act are able to seek redress in the federal courts *to the extent they were able to prior to the decision in Suter v. Artist M.* ...." H.R.CONF.REP. No. 761, 103d Cong., 2d Sess. 926 (1994) (italics added). Two district courts have considered § 1320a–2 and have so read the provision. *See Harris v. James*, 883 F.Supp. 1511, 1519 (M.D.Ala.1995) (explaining that in § 1320a–2, Congress "mandated that courts continue to apply a pre-*Suter* approach"); *Jeanine B. ex rel. Blondis v. Thompson*, 877 F.Supp. 1268, 1283 (E.D.Wis.1995) (explaining that § 1320a–2 requires courts to " 're-wind the clock' and look to cases prior to

---

**11.** The district court found the District in violation of six provisions of the Act. *See infra* note 13.

*Suter* to determine the enforceability of other provisions").[12]

My colleagues see things differently. They say that because Congress did not identify the specific *Suter* "grounds" it wished to reject, it must not have meant to reject any grounds. Maj. op. at 570. Even if that argument made any sense, it still would directly contradict both the language of the *Suter* amendment, which overturns "any such grounds" applied in *Suter* but not applied in prior Supreme Court decisions, *see* 42 U.S.C. § 1320a–2, and the "hornbook law" presumption against "interpreting a statute in a way which renders it ineffective," *see Federal Trade Comm'n v. Manager, Retail Credit Co., Miami Branch Office,* 515 F.2d 988 (D.C.Cir.1975).

In short, Congress has directed the federal courts not to consider *Suter* in deciding whether there may be private enforcement of the Act, while my colleagues have directed the district court to do just the opposite.

Congress' command raises constitutional problems of its own. Congress may not prescribe rules of decision for cases pending in the federal courts. *See United States v. Klein,* 80 U.S. (13 Wall.) 128, 146–48, 20 L.Ed. 519 (1871); *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311, 1314–15 (9th Cir. 1990), *rev'd on other grounds,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). *But cf. Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1447, 1457, 131 L.Ed.2d 328 (1995). And it is far from certain whether Congress may, consistent with principles of separation of powers and the independence of the judicial branch, direct the lower federal courts to disregard the reasoning of an otherwise binding Supreme Court decision.

There is no reason why the district court, and ultimately this court, should have to ponder this serious question or the other constitutional issues the majority sends back to it, issues raised by the dictum in *DeSha-*

*ney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), with respect to the in-custody children. Maj. op. at 566 n. 9. For more than a century, the Supreme Court has endorsed the practice of deciding cases on the basis of a pendent state-law claim in order to avoid constitutional questions. *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Siler v. Louisville & Nashville R.R.,* 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909); *Santa Clara County v. Southern Pacific R.R.,* 118 U.S. 394, 6 S.Ct. 1132, 30 L.Ed. 118 (1886). *Pennhurst II* itself stressed that nothing in its decision regarding the immunity of states under the Eleventh Amendment was "meant to cast doubt on the desirability of applying the principle [of avoiding constitutional questions] in cases where the federal court has jurisdiction to decide the state-law issues." 465 U.S. at 118–19 n. 28, 104 S.Ct. at 918 n. 28. And in a later case, the Supreme Court held that it was an abuse of discretion for a court of appeals to reach a federal constitutional question when it could have avoided doing so by deciding the case on pendent state-law grounds. *Schmidt v. Oakland Unified Sch. Dist.,* 457 U.S. at 595, 102 S.Ct. at 2612.

The majority opinion turns the table upside down. Again ignoring higher authority, the majority orders the district court to abuse its discretion by deciding the constitutional issues.

IV

It is time to bring this opinion to a close. The majority's opinion disregards the law of this court and of the Supreme Court. My colleagues do not like the idea of a federal district court issuing a decree to govern local institutions. Nor do I, nor, for that matter,

---

12. Before *Suter,* federal courts had sustained private actions brought under 42 U.S.C. § 1983 to enforce the Act's provisions. *See, e.g., Timmy S. v. Stumbo,* 916 F.2d 312, 316 (6th Cir.1990) (determining that the "reasonable promptness" provision of 42 U.S.C. § 671(a)(12) is enforceable under 42 U.S.C. § 1983); *L.J. ex rel. Darr v. Massinga,* 838 F.2d 118, 123 (4th Cir.1988), *cert.*

*denied,* 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989) (holding the substantive requirements listed in § 671(a)(9), (10) & (16) enforceable under § 1983); *Lynch v. Dukakis,* 719 F.2d 504, 512 (1st Cir.1983) (concluding that the case plan requirements of § 671(a)(16) and § 675(1) & (5)(B) are enforceable under § 1983).

does the district judge in this case. But we are sworn to uphold the law. I therefore dissent.

## ADDENDUM

The case went to trial four years ago. Two weeks of testimony revealed the District of Columbia's deficient, inept administration of its foster care system. This testimony, together with more than a thousand admissions of fact by the District, showed that District officials had consistently failed to carry out responsibilities imposed on them by federal and local laws. *LaShawn A. v. Dixon,* 762 F.Supp. 959, 960, 986–87 (D.D.C. 1991). These were far from minor infractions. The transgressions psychologically, emotionally and physically harmed those children in the District's foster care system and those children who, although not yet in the District's care, were known to the District because of reported abuse and neglect. *Id.* at 987.

The district court thus reached the "inescapable conclusion" that the District's foster care system complied with neither "federal law, District law, [n]or, for those plaintiffs in the District's foster care, the United States Constitution." *Id.* at 960–61. The District's administration of its foster care system violated numerous provisions of the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 620–627 and §§ 670–679, and the Child Abuse Prevention and Treatment Act, 42 U.S.C. §§ 5101–5106.[13] The Adoption Assistance Act, the court held, conferred upon the plaintiffs rights that were privately enforceable under 42 U.S.C. § 1983, which the District had violated by depriving plaintiffs of those rights. 762 F.Supp. at 988–90.

The district court also found that the District's operation of its foster care system violated numerous provisions of the District's Prevention of Child Abuse and Neglect Act of 1977, D.C.Law 2–22 (Sept. 23, 1977) (codified as amended at D.C.Code Ann. §§ 2–1351 to –1357, §§ 6–2101 to –2107, §§ 6–2121 to –2127, and §§ 16–2351 to –2365); the Youth Residential Facilities Licensure Act of 1986, D.C.Law 6–139 (Aug. 13, 1986) (codified as amended at D.C.Code Ann. §§ 3–801 to –808); and the Child and Family Services Division Manual of Operations (September 1985). The District's obligations under its own laws parallel almost exactly the requirements of federal law. *LaShawn A. ex rel. Moore v. Kelly,* 990 F.2d 1319, 1324 (D.C.Cir. 1993) ("*LaShawn I*"). Analogizing the rights of children in foster care to rights of those involuntarily committed, *LaShawn,* 762 F.Supp. at 992, the district court ruled that these laws conferred liberty and property interests, protected under the Fifth Amendment, on the children in the custody of the District's foster care system, *id.* at 994. The District had violated § 1983 by depriving the children in foster care of these constitutionally protected interests. 762 F.Supp. at 998.

The parties worked out a remedial order designed to correct deficiencies in the District's administration of its foster care system, and the district court entered it.

**13.** Specifically, the court found the District in violation of the following requirements imposed upon recipients of federal funding for child welfare programs: (1) 42 U.S.C. § 5106a(b)(2) (requiring prompt investigations into reports of abuse or neglect and necessary action to protect welfare of abused or neglected children), 762 F.Supp. at 968–70; (2) 42 U.S.C. § 5106a(b)(3) (requiring demonstration of program to ensure effective treatment of child abuse and neglect cases), 762 F.Supp. at 970; (3) 42 U.S.C. § 671(a)(15) (requiring provision of services to enable a child for whom a report has been made to remain in the home or, if removal is necessary, to enable the child to return home as quickly as possible), 762 F.Supp. at 970; (4) 42 U.S.C. § 672(e) (mandating that a child return home within 180 days unless a judicial determination has been made that foster care placement is in the child's best interests), 762 F.Supp. at 971; (5) 42 U.S.C. § 675(5)(A) (requiring procedures to assure children are placed in least restrictive settings), 762 F.Supp. at 971; (6) 42 U.S.C. § 675(1) (requiring timely preparation of case plans containing specific information), 762 F.Supp. at 972–73; (7) 42 U.S.C. § 675(5)(B) (requiring review of child's status at least every six months), 762 F.Supp. at 974; and (8) 42 U.S.C. § 627(a)(2)(A) (requiring operation of information system from which status, location and goals for placement of all foster care children may be readily determined), 762 F.Supp. at 976–77.

The District appealed, contending that the district court erred in finding that the administration of the District's foster care system violated the Fifth Amendment and that the intervening decision in *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), precluded any private cause of action under § 1983 or federal child welfare statutes. *LaShawn I*, 990 F.2d at 1321–22. Recognizing that the appeal raised "complex constitutional and federal statutory issues," we held that it was unnecessary to reach the District's challenges. *Id.* at 1324. Under District law, children reported to have been abused or neglected had a private right of action under the District's Prevention of Child Abuse and Neglect Act. *Turner v. District of Columbia*, 532 A.2d 662 (D.C. 1987). Because a government owes greater duties toward those in its custody, we concluded that the children in the District's foster care system also had a private right of action under the Act. *LaShawn I*, 990 F.2d at 1325. In addition, we noted that the other District statute relied on by the children, the Youth Residential Facilities Licensure Act, explicitly provides these children with a private cause of action to sue under the Prevention of Child Abuse and Neglect Act. *Id.* at 1325–26. These statutes, we held, "provide[d] an independent basis for supporting the district court's judgment." *Id.* at 1326. This court's authority to decide the case entirely on the pendent local claims, we stated, was "incontrovertible" under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).